An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123

IN THE SUPREME COURT OF THE STATE OF NEVADA

MAMIE HUBBARD-WASHINGTON,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 58976

FILED

FEB 13 2013

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK



## ORDER OF AFFIRMANCE

This is an appeal from a judgment of conviction entered pursuant to a jury verdict of five counts of child abuse and neglect. Eighth Judicial District Court, Clark County; Abbi Silver, Judge.

<u>Sufficiency of the evidence</u>

Appellant Mamie Hubbard-Washington contends that insufficient evidence supports her convictions because the State failed to prove that the victims suffered unjustified physical or mental injury. We review the evidence in the light most favorable to the prosecution and determine whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt. <u>McNair v. State</u>, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). Here, the jury heard testimony that Hubbard-Washington was a special education teacher assigned to the autism classroom at Doris Reed Elementary School. She had five non-verbal autistic children in her classroom: Matthew, Isaiah, Joanna, Walker, and Bradley.

Matthew self-stimulated by jumping up and running around. Hubbard-Washington restrained Matthew by grabbing his arm or arms and forcing him into his seat, she pinched Matthew and hit his desk with a

13-04657

yardstick when he failed to comply with her orders, and several times she hit him on the arms and legs with a yardstick. Whenever Hubbard-Washington approached Matthew's desk with a yardstick, Bradley reacted by crying and Christopher covered his ears and cried. On one occasion, Hubbard-Washington physically restrained Matthew in a manner that caused him to suffer a cut lip and a chipped tooth. Matthew's mother removed him from school because of an unexplained black eye, the chipped tooth, and behavioral changes: Matthew started screaming for no apparent reason and began to flinch if she walked too close or reached to give him a hug.

Isaiah self-stimulated by filling his mouth with food. On one occasion, Hubbard-Washington grabbed and dragged Isaiah to the back of the classroom, forced his head into a trash can, and yelled at him. Isaiah whimpered and spit the food out. On another occasion, Hubbard-Washington yelled at Isaiah for failing to follow her instructions while the other children cowered, placed their hands in front of their faces, and shook. Hubbard-Washington grabbed Isaiah by the neck and shoved his head against the table and, when Isaiah remained inattentive, she open-handedly backhanded him. Isaiah's mother observed that Isaiah began regressing several months after he was transferred to Hubbard-Washington's classroom: Isaiah locked himself in the bathroom and hid his shoes to avoid going to school, acted aggressively towards his sister and baby brother, and was angry with his mother when he came home from school.

Joanna tended to come to school with messy hair. Hubbard-Washington combed Joanna's hair to show her parents that it could be done and to teach self-help skills. However, when Joanna grunted, cried,

and squirmed, Hubbard-Washington hit her with a comb or brush which caused her to flinch. On one occasion, after Joanna soiled herself, Hubbard-Washington took her into the bathroom and screamed, "You will not go to the bathroom on yourself, do you hear me?" On another occasion, Joanna suffered a urinary tract infection because Hubbard-Washington refused to follow Joanna's individualized education program, which required Joanna to use wipes and be supervised when she went to the bathroom to ensure her cleanliness. And on a third occasion, when Joanna refused to eat, Hubbard-Washington tried to force Joanna to eat by putting her hands over Joanna's hands, putting food in her mouth, and yelling at her. Joanna's grandmother observed behavioral changes in Joanna a few months after she entered Hubbard-Washington's class: Joanna stopped whistling—her way of communicating, would not let anyone touch her face, cried about her hair and panicked when it was down, and covered her face and cowered in the bathroom.

Christopher self-stimulated by banging his head against desks, cabinets, and even people when he was frustrated. Hubbard-Washington tried to stop Christopher's head-banging by grabbing his face, shoulders, or arms. She grabbed him hard enough to leave marks and scratches on his arms. When Hubbard-Washington slapped Christopher and told him not to bang his head in the classroom, the other children flinched and cried. Christopher stopped head-banging after Hubbard-Washington started hitting his forehead with her knuckles and threatened to hit him every time he banged his head. Hubbard-Washington hit Christopher hard enough to make sounds, leave bruises, and cause him to cry.

Bradley cried a lot and when he cried Hubbard-Washington yelled at him and pinched his thighs. On several occasions, Bradley came home from school with bruises on his back, arms, and hands. Before Hubbard-Washington became his teacher, Bradley enjoyed school and was able to communicate through the picture exchange communication system and functional sign language. After Hubbard-Washington became Bradley's teacher, Bradley's mother observed behavioral changes: Bradley's communication skills digressed; he resisted going to school, he clung to his mother when she took him to school and cried when she left him there; he reacted to loud noises and crying by flinching, cowering, and protecting his head; and he became physically aggressive towards other family members.

The jury also heard testimony that Hubbard-Washington would grab the children if they were not listening, yell at them to sit down and be quiet, and yell at them if they did not hang their jackets and backpacks on the coat rack the right way or fast enough. The children reacted by flinching and cowering. When Hubbard-Washington moved away from her desk, the children would raise their heads, track her movements, and cringe or put their hands up when she passed by. The children did not react this way around other members of the teaching staff. An expert witness testified that when autistic children, in a classroom setting, watch a person closely and follow that person's movement they are tracking and that usually means that they are being intimidated. The expert further testified that when autistic children cower, cover their heads, and shrink down in their chairs they are exhibiting classic symptoms of abuse where pain is being used to induce compliance. And the expert opined that the use of yelling and pinching to

induce compliance could affect the intellectual or psychological capacity and emotional condition of an autistic child.

Hubbard-Washington did not provide complete transcripts of all the evidence presented during her trial. Nonetheless, based on the record that she did provide, we conclude that a rational juror could reasonably infer that Hubbard-Washington caused each of the children to suffer, or placed each of the children in a situation where they may have suffered, mental injury from child abuse or neglect. See NRS 200.508(1), (4)(a); NRS 432B.070; NRS 432B.150. It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. See Bolden v. State, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

Juror-initiated question

Hubbard-Washington contends that the district court erred by overruling her objection to a juror-initiated question. The question asked the State's expert witness, "Can positive or good control 'every [sic] exist' from the methods that Mrs. Washington used, dash, both her physical methods and from her yelling methods?" Hubbard-Washington argues that the manner in which the question was posed stripped her of the presumption of innocence and no amount of cross-examination could erase the ensuing prejudice. We have recognized the benefits and inherent dangers of juror-initiated questions and concluded that "allowing juror-inspired questions in a criminal case is not prejudicial per se, but is a matter committed to the sound discretion of the trial court." Flores v. State, 114 Nev. 910, 913, 965 P.2d 901, 902 (1998), as amended (1999). Here, Hubbard-Washington had an opportunity to cross-examine the

expert witness, she does not claim that the district court failed to follow the procedural safeguards prescribed in Flores, and the trial transcript indicates that the jury was properly admonished not to form opinions about the case until it was submitted for deliberations. See NRS 175.401(3); Flores, 114 Nev. at 912-13, 965 P.2d at 902. Accordingly, we conclude that Hubbard-Washington has not demonstrated that the district court abused its discretion by overruling her objection to the juror's question.

Vagueness challenge

Hubbard-Washington contends that the district court erred by denying her motion to dismiss the information on grounds that NRS 200.508 is unconstitutionally vague. She argues that the statute does not clearly inform ordinary people what types of conduct may result in unjustifiable "physical pain" or "mental suffering" and fails to sufficiently delineate the boundary between legal and illegal conduct.

We review a district court's decision to grant or deny a motion to dismiss a charging document for abuse of discretion, Hill v. State, 124 Nev. 546, 550, 188 P.3d 51, 54 (2008), and the constitutionality of a statute de novo, Nelson v. State, 123 Nev. 534, 540, 170 P.3d 517, 522 (2007). Statutes are presumed to be valid and the challenger bears the burden of demonstrating their unconstitutionality. Id. A statute is unconstitutionally vague "(1) if it fails to provide a person of ordinary intelligence fair notice of what is prohibited; or (2) if it is so standardless that it authorizes or encourages seriously discriminatory enforcement." State v. Castaneda, 126 Nev. ___, ___, 245 P.3d 550, 553 (2010) (emphasis added, internal quotation marks omitted). "Although mathematical precision is not possible in drafting statutory language, the law must, at a

minimum, delineate the boundaries of unlawful conduct. Some specific conduct must be deemed unlawful so individuals will know what is permissible behavior and what is not." City of Las Vegas v. Dist. Ct., 118 Nev. 859, 864, 59 P.3d 477, 481 (2002) (footnote omitted), abrogated on other grounds by Castaneda, 126 Nev. at ___ n.1, 245 P.3d at 553 n.1.

NRS 200.508(1) provides that,

> [a] person who willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as a result of abuse or neglect

is guilty of child abuse and neglect. (Emphasis added.) Because the terms "physical pain" and "mental suffering" are tethered to the term "abuse or neglect," the definition of "abuse or neglect" necessarily informs the reader as to the meaning of "physical pain" and "mental suffering." NRS 200.508(4)(a) states that

> "[a]buse or neglect" means physical or mental injury of a nonaccidental nature, sexual abuse, sexual exploitation, negligent treatment or maltreatment of a child under the age of 18 years, as set forth in paragraph (d) and NRS 432B.070, 432B.100, 432B.110, 432B.140 and 432B.150, under circumstances which indicate that the child's health or welfare is harmed or threatened with harm.

Paragraph (d) states that, "'Physical injury' means: (1) Permanent or temporary disfigurement; or (2) Impairment of any bodily function or organ of the body." NRS 432B.070 states that, "'Mental injury' means an injury to the intellectual or psychological capacity or the emotional condition of a child as evidence by an observable and substantial impairment of the ability of the child to function within a normal range of

performance or behavior." And NRS 432B.150 states that, "Excessive corporal punishment may result in physical or mental injury constituting abuse or neglect of a child."

We conclude that NRS 200.508 and the statutes that it references adequately define the terms "physical injury" and "mental suffering" and place a person of ordinary intelligence on notice that willful and nonaccidental behavior that places a child at risk of disfigurement; impairment of a bodily function; or loss of intellectual, psychological, or emotional capacity is impermissible and punishable as a felony. Accordingly, Hubbard-Washington has not met her burden to demonstrate the statute's unconstitutionality and the district court did not abuse its discretion by denying Hubbard-Washington's motion to dismiss the information.

Criminal information

Hubbard-Washington contends that the district court erred by denying her motion to dismiss the information on grounds that it failed to charge an offense. She argues that the information did not specify when the alleged offenses occurred, repeatedly used "and/or" to connect factual allegations, and included allegations of non-criminal conduct. As stated above, we review a district court's decision to grant or deny a motion to dismiss a charging document for abuse of discretion. Hill, 124 Nev. at 550, 188 P.3d at 54.

NRS 173.075(1) specifies that "the information must be a plain, concise and definite written statement of the essential facts constituting the offense charged." The sufficiency of an information is determined by practical considerations. Laney v. State, 86 Nev. 173, 178, 466 P.2d 666, 669 (1970). The test is whether the information standing

alone contains the elements of the offense intended to be charged and is sufficient to apprise the defendant of the nature of the offense so that she may adequately prepare a defense. Id.

Here, the information adequately informed Hubbard-Washington when the offenses were alleged to have occurred, see Cunningham v. State, 100 Nev. 396, 400, 683 P.2d 500, 502 (1984) ("Unless time is an essential element of the offense charged, there is no absolute requirement that the state allege the exact date."), and consisted of coherent factual allegations that identified the means by which she committed these offenses, see NRS 173.075(2); Hidalgo v. Dist. Ct., 124 Nev. 330, 338, 184 P.3d 369, 375 (2008) (discussing the use of "and/or" in a death penalty notice). We conclude that the information provided sufficient notice of the nature of the alleged offenses and that the district court did not abuse its discretion by denying Hubbard-Washington's motion to dismiss the information.

Having considered Hubbard-Washington's contentions and concluded she is not entitled to relief, we

ORDER the judgment of conviction AFFIRMED.


_____, J.
Hardesty

_____, J.          _____, J.
Parraguirre                          Cherry

cc:   Hon. Abbi Silver, District Judge
Thomas Michaelides
Attorney General/Carson City
Clark County District Attorney
Eighth District Court Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A

10